T.C. Memo. 2011-277

UNITED STATES TAX COURT

JOHN E. AND FRANCES L. ROGERS, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 22667-07.                Filed November 23, 2011.

<u>Paul J. Kozacky</u> and <u>Nicholas C. Mowbray</u>, for petitioners.

<u>Laurie A. Nasky</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HAINES, <u>Judge</u>:  Respondent determined a deficiency in petitioners' Federal income tax of $1,302,102 and an accuracy-related penalty under section 6662(a) of $260,420 for 2003.[1]

---

[1]Unless otherwise indicated, section references are to the Internal Revenue Code, as amended and in effect for the year in issue.  Rule references are to the Tax Court Rules of Practice
(continued...)

After stipulations[2] the issues remaining for decision are: (1) Whether Portfolio Properties, Inc. (PPI), an S corporation incorporated under the laws of Illinois, must include $1,190,500 in income for 2003;[3] (2) whether PPI is entitled to deduct in 2003 legal and professional fees attributable to the $1,190,500; and (3) whether a $218,499 distribution from PPI to its sole shareholder, petitioner John Rogers (Rogers), is includable in petitioners' gross income for 2003.

Some of the facts have been stipulated and are so found. The stipulation of facts, the supplemental stipulation of facts, the stipulation of settled issues, and the exhibits attached thereto are incorporated herein by this reference. At the time they filed their petition, petitioners resided in Illinois.

---

[1](...continued)
and Procedure. Amounts are rounded to the nearest dollar.

[2]On Feb. 5, 2010, the Court filed the parties' stipulation of settled issues, resolving many of the issues set forth in the notice of deficiency. On Mar. 4, 2010, the Court filed the parties' supplemental stipulation of settled issues, resolving additional issues, including the accuracy-related penalty under sec. 6662(a).

[3]Petitioner John Rogers is the sole shareholder of PPI. Because PPI is an S corporation, we must determine the income and deduction items of PPI before determining petitioners' income. Where a notice of deficiency includes adjustments for S corporation items with other adjustments, we have jurisdiction to determine the correctness of all adjustments. See Winter v. Commissioner, 135 T.C. 238 (2010).

FINDINGS OF FACT

Rogers is a tax attorney with over 40 years of experience. He received a law degree from Harvard University in 1967 and a master's degree in business administration from the University of Chicago. He worked in the tax department of Arthur Andersen for over 24 years before serving for 7 years as the tax director and assistant treasurer at FMC Corp. In 2003 Rogers was a partner with the law firm Altheimer & Gray until its bankruptcy on June 30, 2003. For the remainder of the year Rogers was a partner with the law firm Seyfarth Shaw, LLP.

Rogers promoted to clients "tax advantaged" transactions that dealt with the acquisition of, and sales of indirect interests in, Brazilian consumer receivables.[4] The instant case is an offshoot of those transactions. Our concern is not with the consumer receivables transactions themselves, but with the income tax, if any, resulting from the receipt of money from investors by Rogers' controlled entities and by Rogers himself.

Rogers set up three business entities to manage numerous holding and trading companies used in the Brazilian receivable transactions. The first, PPI, was incorporated under the laws of Illinois on April 1, 1989, and elected on January 1, 1992, to be treated as an S corporation under section 1361(a)(1). Rogers was

---

[4]For the details of these transactions, see Superior Trading, LLC v. Commissioner, 137 T.C. 70 (2011).

its sole shareholder. The second, Jetstream Business Limited (Jetstream), a British Virgin Islands limited company, was formed by Rogers with PPI as its sole shareholder. Rogers was Jetstream's only director. In 2003 Jetstream was treated as a disregarded entity for Federal tax purposes. The third, Warwick Trading, LLC (Warwick), an Illinois limited liability company (LLC), was formed in 2001. In 2003 Jetstream was the managing member of Warwick. Consequently, in 2003 Rogers had sole control over PPI, Jetstream, and Warwick.

In 2003 Warwick entered into transactions directly and through affiliated entities for, in effect, purchasing Brazilian consumer receivables and selling interests in them to numerous investors through trading and holding companies.[5] The investors paid an aggregate of $2,381,000, all apparently for acquiring such interests. Of the $2,381,000, Warwick received and transferred $1,190,500 to Multicred Investamentos Limitada (Multicred), a Brazilian collection company. The other $1,190,500 was deposited directly in PPI's bank account on behalf of Jetstream. None of Warwick, Jetstream, or PPI had any obligation to transfer the $1,190,500 deposited directly in PPI's bank account to anyone, hold the funds in escrow, or segregate the funds from any other use.

---

[5]See id.

Rogers prepared PPI's 2003 Form 1120S, U.S. Income Tax Return for an S Corporation. PPI reported $1,958,877 of gross receipts or sales, including income of $27,877 from transactions unrelated to the receivables, and a deduction of $1,190,500 for the $1,190,500 transferred to Multicred. Lucas & Rogers Capital, Inc. (L&R), a second S corporation with Rogers as its sole shareholder, reported $450,000 of gross receipts in 2003 attributable to investor money for the receivables. The parties agree that the $450,000 L&R reported as gross receipts in 2003 should have been reported by PPI. Further, the parties agree that the $1,190,500 transferred to Multicred is not includable in PPI's income and does not entitle PPI to a deduction.

PPI distributed $732,000 to Rogers in 2003. Petitioners deposited this amount in their joint bank account. PPI deducted $513,501 of this amount as legal and professional fees paid to Rogers.[6] In turn, petitioners included the $513,501 Rogers received from PPI as income on their Schedule C, Profit or Loss From Business. Petitioners did not report the remaining $218,499 distribution as income in 2003. Petitioners had no obligation to transfer the $218,499 to anyone, hold the funds in escrow, or segregate the funds from their personal funds.

---

[6]PPI also deducted $22,039 of legal and professional fees paid to Altheimer & Gray and Seyfarth Shaw.

On August 24, 2007, respondent issued a statutory notice of deficiency to petitioners determining, among other things, that the $218,499 was income to petitioners in 2003. On October 2, 2007, the Court filed petitioners' timely petition.

OPINION

## I. Burden of Proof

The Commissioner's determinations in the notice of deficiency are generally presumed correct, and the taxpayers bear the burden of proving them incorrect. See Rule 142(a)(1). Petitioners do not argue that the burden of proof shifts to respondent pursuant to section 7491(a), nor have they shown that the threshold requirements of section 7491(a) have been met. The burden therefore remains on petitioners with respect to all issues to prove that respondent's determination of the deficiency in income tax is erroneous.

## II. PPI

### A. Gross Income

Generally, unless otherwise provided, gross income under section 61 includes all accessions to wealth from whatever source derived. Commissioner v. Glenshaw Glass Co., 348 U.S. 426, 431 (1955). Moreover,

> gain * * * constitutes taxable income when its recipient has such control over it that, as a practical matter, he derives readily realizable economic value from it. That occurs when cash * * * is delivered by its owner to the taxpayer in a manner which allows the recipient freedom to dispose of it at will, even though it may have been obtained by fraud and

> his freedom to use it may be assailable by someone with a better title to it. [Rutkin v. United States, 343 U.S. 130, 137 (1952); citations omitted.]

See also United States v. Rochelle, 384 F.2d 748, 751 (5th Cir. 1967); McSpadden v. Commissioner, 50 T.C. 478, 490 (1968). The economic benefit accruing to the taxpayer is the controlling factor in determining whether a gain is income. Rutkin v. United States, supra at 137; United States v. Rochelle, supra at 751.

In 2003 PPI reported $1,958,877 of gross receipts or sales, including income of $27,877 from transactions unrelated to the receivables and the $1,190,500 transferred to Multicred. Additionally, PPI deducted the $1,190,500 transferred to Multicred. The parties subsequently have agreed that the $450,000 L&R reported as gross receipts in 2003 should have been reported by PPI, and the $1,190,500 transferred to Multicred (1) is not includable in PPI's income, and (2) does not entitle PPI to a deduction. Therefore, PPI's gross income for 2003 is its reported gross receipts or sales of $1,958,877, plus $450,000 from L&R, less the $1,190,500 that was transferred to Multicred, for a total of $1,218,377.

Inconsistent with PPI's 2003 Form 1120S, as prepared by Rogers, petitioners argue that the $1,190,500 PPI received from investors was not income to PPI. Rather, petitioners argue that the $1,190,500 was: (1) Held in trust on behalf of Warwick or

Jetstream; or (2) income to Warwick. Neither of these contentions has merit.

In <u>Superior Trading, LLC v. Commissioner</u>, 137 T.C. 70 (2011), we held that Warwick was not a partnership for Federal tax purposes. Rather, Warwick was a single-member LLC with Jetstream as its only member. Because Warwick did not make an election to be treated as an association under the so-called check-the-box regulations, it was a disregarded entity in 2003 for Federal tax purposes. See sec. 301.7701-3(b)(1)(ii), Proced. & Admin. Regs.

Jetstream was also a disregarded entity in 2003 for Federal tax purposes. Because both Warwick and Jetstream were disregarded entities for Federal tax purposes, the $1,190,500 received from the investors is attributable only to PPI. Nothing in the record supports petitioners' argument that PPI was required to hold these funds on behalf of or for the benefit of any other person or entity. The $1,190,500 deposited in PPI's bank account constituted unrestricted funds. In fact, PPI distributed $732,000 of these funds to Rogers. Consequently, the $1,190,500 PPI received from the investors is income to PPI in 2003.

B.   <u>Deductions</u>

Deductions are a matter of legislative grace, and the taxpayer must prove he is entitled to the deductions claimed.

Rule 142(a); <u>New Colonial Ice Co. v. Helvering</u>, 292 U.S. 435, 440 (1934). Section 162(a) provides that "There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business".

In 2003 PPI deducted legal and professional fees of $513,501 paid to Rogers and $22,039 paid to Altheimer & Gray and Seyfarth Shaw. In turn, petitioners included the $513,501 Rogers received from PPI as income on their Schedule C. The parties agree that if PPI must include in income the $1,190,500 received from investors, it is entitled to a deduction for legal and professional fees incurred with respect to the $1,190,500. We agree with this position. Consistent with our holding that the $1,190,500 is PPI's income, PPI is entitled to deduct legal and professional fees of $513,501 paid to Rogers and $22,039 paid to Altheimer & Gray and Seyfarth Shaw.

III. <u>The $218,499 Distribution</u>

A. <u>S Corporation Rules</u>

On its face, the $218,499 transfer from PPI to Rogers is a distribution from an S corporation to a shareholder. Generally, section 1368(b) provides that distributions from an S corporation with no accumulated earnings and profits (E&P) of a predecessor C corporation are not included in the gross income of the shareholder to the extent that they do not exceed the adjusted

basis of the shareholder's stock, and any excess over adjusted basis is treated as gain from the sale or exchange of property. If the S corporation has accumulated E&P of a predecessor C corporation, then the portion of the distributions in excess of the S corporation's accumulated adjustment account (AAA) is treated as a dividend to the extent it does not exceed the accumulated E&P. Sec. 1368(c)(1) and (2). The AAA is intended to measure the accumulated taxable income of an S corporation that has not been distributed to the shareholders. See Williams v. Commissioner, 110 T.C. 27, 30 (1998). The portion of a distribution to a shareholder that does not exceed the AAA is a nontaxable return of capital to the extent of the shareholder's adjusted basis in S corporation stock. Sec. 1368(b) and (c)(1). The AAA is increased for the S corporation's income and decreased for the S corporation's losses and deductions and for nontaxable distributions to shareholders. See secs. 1367 and 1368.

Section 1366(a)(1) provides that a shareholder shall take into account his or her pro rata share of the S corporation's items of income, loss, deduction, or credit for the S corporation's taxable year ending with or in the shareholder's taxable year. Section 1367 provides that basis in S corporation stock is increased by income passed through to the shareholder under section 1366(a)(1), and decreased by, inter alia,

distributions not includable in the shareholder's income pursuant to section 1368.

Unless a statutory or legal principle applies to remove the $218,499 distribution from the S corporation rules described above, these rules will govern whether the $218,499 distribution from PPI to Rogers is income to petitioners and, if so, the character of that income. Petitioners argue that the rules should not apply because the $218,499 distribution from PPI to Rogers was not a distribution from an S corporation to a shareholder, but rather, a distribution to a fiduciary to be held in trust.

B.  Petitioners' Trust Argument

Petitioners argue that Rogers held the $218,499 distribution from PPI in trust pursuant to a duty of loyalty to Warwick under the Illinois Limited Liability Company Act (Illinois LLC Act). The Illinois LLC Act requires the manager of an Illinois LLC to "account to the company and to hold as trustee for it any property, profit, or benefit derived by the member in the conduct or winding up of the company's business". 805 Ill. Comp. Stat. Ann. 180/15-3(b)(1) (West 2010). Petitioners contend that the $218,499 distribution from PPI to Rogers is not income to petitioners because Rogers held this amount in a fiduciary capacity as manager of Warwick through Jetstream.

Petitioners' reliance on the Illinois LLC Act is illogical and misguided.  PPI, and not Warwick, distributed the $218,499 in question to Rogers.  PPI is an S corporation and is not subject to the Illinois LLC Act.  We have no reason to view the transaction at issue as anything more than a distribution from an S corporation to a shareholder.  Therefore, PPI's $218,499 distribution to Rogers does not give rise to a duty of loyalty pursuant to the Illinois LLC Act.

Rogers did not have a fiduciary duty to PPI under the Illinois LLC Act, but he was a shareholder, officer, and director of PPI.  Generally, "a taxpayer need not treat as income moneys which he did not receive under a claim of right, which were not his to keep, and which he was required to transmit to someone else as a mere conduit."  Diamond v. Commissioner, 56 T.C. 530, 541 (1971), affd. 492 F.2d 286 (7th Cir. 1974).  Thus, money a taxpayer receives in his or her capacity as a fiduciary or agent does not constitute income to that taxpayer, Herman v. Commissioner, 84 T.C. 120, 134-136 (1985); Heminway v. Commissioner, 44 T.C. 96, 101 (1965), and a shareholder who takes personal control of corporate funds is not taxable on them so long as it is shown that he held the funds as an agent of the corporation and/or deployed them for a corporate purpose, AJF Transp. Consultants, Inc. v. Commissioner, T.C. Memo. 1999-16, affd. without published opinion 213 F.3d 625 (2d Cir. 2000); St.

Augustine Trawlers, Inc. v. Commissioner, T.C. Memo. 1992-148, affd. sub nom. O'Neal v. Commissioner, 20 F.3d 1174 (11th Cir. 1994); Alisa v. Commissioner, T.C. Memo. 1976-255.

Whether Rogers was acting as an agent of PPI is a question of fact. See Pittman v. Commissioner, 100 F.3d 1308, 1314 (7th Cir. 1996) (question of fact whether C corporation's shareholder's diversion of corporate funds constitutes constructive dividend), affg. T.C. Memo. 1995-243. We look to Rogers' testimony and the objective facts to ascertain his intent. See, e.g., Busch v. Commissioner, 728 F.2d 945, 948 (7th Cir. 1984) (objective factors used to determine intent), affg. T.C. Memo. 1983-98; Spheeris v. Commissioner, 284 F.2d 928, 931 (7th Cir. 1960) (legal relationship between a closely held corporation and its shareholders as to payments to the latter "must be established by a consideration of all relevant factors indicating the true intent of the parties"), affg. T.C. Memo. 1959-225; Kaplan v. Commissioner, 43 T.C. 580, 595 (1965).

Petitioners rely on Seven-Up Co. v. Commissioner, 14 T.C. 965 (1950), and Mich. Retailers Association v. United States, 676 F. Supp. 151 (W.D. Mich. 1988), to support their fiduciary theory. In Seven-Up Co., Seven-Up Co. (7-Up) manufactured and sold extract for a soft drink to various franchised bottlers. To fund a national advertising campaign, participating bottlers were required to pay 7-Up $17.50 per gallon of extract purchased. The

funds were administered by 7-Up and were to be spent solely for advertising purposes. The funds were accounted for separately on the company's books but were not placed in a separate bank account. This arrangement was the result of a well-documented arm's-length negotiation between 7-Up and the bottlers. Further, in a letter sent to each bottler 7-Up acknowledged its role as a trustee handling the bottlers' money for the purpose of a national advertising campaign.

The Commissioner contended that the excess of the amounts received by 7-Up over the advertising expenses incurred and paid constituted income to 7-Up. In holding that the excess was not taxable, we stated:

> While petitioner had the right to receive the bottlers' contributions under its agreements with them, all the facts and circumstances surrounding the transaction clearly indicate that it was the intention of all of the parties concerned that these contributions were to be used to acquire national advertising for the 7-Up bottled beverage and for that purpose only, and that petitioner was to be a conduit for passing on the funds contributed to the advertising agency which was to arrange for and supply the national advertising. * * * Although the funds were not all expended in the year received, for reasons set forth in our findings, petitioner did expend them for national advertising, did not use them for general corporate purposes, treated the amounts on hand in the fund on its books as a liability to the bottlers, and considered itself, as evidenced by its letter of May 2, 1944, to one of the participating bottlers, merely as a trustee, handling the bottlers' money. [Seven-Up Co. v. Commissioner, supra at 977-978.]

In Mich. Retailers Association v. United States, supra, Michigan Retailers Association (MRA), a not-for-profit

corporation, was the master policy holder of two group health insurance policies for its members. As master policy holder, MRA received premium credits from insurance companies in 1976 and 1977 because premiums received from its members exceeded claims paid for their benefit. The Internal Revenue Service determined that MRA should have reported these premiums as income. MRA argued that the premiums were received and held in trust for the benefit of its members.

The premiums were commingled with other funds; however, they were segregated in MRA's financial records, earmarked for the benefit of its members, and credited to a liability account. Further, MRA's chief officer and board of directors believed that they were obligated to use the premium credits for the benefit of its members. In 1978 MRA executed a declaration of trust acknowledging its rights and responsibilities with respect to the excess premiums. Citing these facts and circumstances, the Court held that MRA was merely a conduit through which excess premiums were returned for the benefit of its members.

Both Seven-Up Co. v. Commissioner, supra, and Mich. Retailers Association v. United States, supra, are clearly distinguishable from the case at hand. In each of those cases, the record supported an understanding among all parties that the moneys received were held in trust for the benefit of others. Here, Rogers testified that he held the $218,499 in trust to pay

administrative costs and to invest further in Brazilian receivables in 2005.  However, petitioners have failed to support this claim with any documentation or outside testimony.  We are not required to accept self-serving testimony, particularly where it is implausible and there is no persuasive corroborating evidence.  E.g., Frierdich v. Commissioner, 925 F.2d 180, 185 (7th Cir. 1991) ("The statements of an interested party as to his own intentions are not necessarily conclusive, even when they are uncontradicted."), affg. T.C. Memo. 1989-393; Lerch v. Commissioner, 877 F.2d 624, 631-632 (7th Cir. 1989), affg. T.C. Memo. 1987-295; Tokarski v. Commissioner, 87 T.C. 74, 77 (1986).  Additionally, a taxpayer's testimony as to intent is not determinative, particularly where it is contradicted by the objective evidence.  Busch v. Commissioner, supra at 948; Glimco v. Commissioner, 397 F.2d 537, 540-541 (7th Cir. 1968) (taxpayer's uncontradicted testimony need not be accepted), affg. T.C. Memo. 1967-119.

The objective evidence in the record contradicts Rogers' contention that he was acting as an agent of PPI in furtherance of a corporate purpose.  Rogers did not hold the $218,499 in escrow or segregate the funds for PPI's use.  Rather, Rogers held and used the funds without restriction.  The $218,499 was transferred to petitioners' joint bank account.  The record is devoid of any evidence establishing either an express or

constructive trust between Rogers and PPI. Further, petitioners have not presented any written agreement providing that Rogers, through PPI, acted as a trustee to hold the $218,499 for the benefit of any other entity. Rogers controlled Warwick, Jetstream, and PPI. Nothing in the record indicates that Rogers used the funds from the sale of the receivables to serve the interest of any of these entities. Rather, Rogers' actions with respect to these funds clearly show that his only interest was to use Warwick, Jetstream, and PPI to avoid tax on his income. Accordingly, we sustain respondent's determination with respect to the trust issue.

IV. Rule 155 Computation

The $218,499 distribution from PPI to Rogers was nothing more than a distribution from an S corporation to a shareholder. PPI was incorporated on April 1, 1989, but did not elect to be treated as an S corporation until January 1, 1992. As a result, it is possible that PPI has accumulated E&P from its predecessor C corporation. Pursuant to the S corporation rules discussed above, if PPI has accumulated E&P then the $218,499 distribution is a dividend to Rogers to the extent it exceeds PPI's AAA but does not exceed its accumulated E&P. If PPI does not have accumulated E&P, then the $218,499 distribution must be treated as a gain from the sale or exchange of property to the extent it exceeds Rogers' basis in his PPI stock. A Rule 155 computation

of PPI's E&P and AAA, as well as Rogers' basis in his PPI stock, is required to make a final determination.

The Court, in reaching its holdings, has considered all arguments made, and, to the extent not mentioned, concludes that they are moot, irrelevant, or without merit.

To reflect the foregoing,

<u>Decision will be entered under Rule 155</u>.