In the

# United States Court of Appeals
## For the Seventh Circuit

No. 19-2468

SUGARLOAF FUND, LLC and JETSTREAM BUSINESS LIMITED,

*Petitioners-Appellants*,

*v.*

COMMISSIONER OF INTERNAL REVENUE,

*Respondent-Appellee*.

Appeal from the United States Tax Court.
No. 30410-12
No. 15857-13
No. 15858-13
No. 165-14
No. 28657-14

ARGUED FEBRUARY 14, 2020 — DECIDED MARCH 6, 2020

Before RIPPLE, SYKES, and SCUDDER, *Circuit Judges*.

SCUDDER, *Circuit Judge*. Before us for a third time is a tax shelter designed by attorney John Rogers that the Tax Court has determined is an abusive sham. We reached the same conclusion in our prior opinions in *Superior Trading, LLC v. Commissioner*, 728 F.3d 676 (7th Cir. 2013), and *Sugarloaf Fund, LLC*

*v. Commissioner*, 911 F.3d 854 (7th Cir. 2018). We do so again here in an appeal focusing on different tax years.

Rather than fill the Federal Reporter with what we said in *Superior Trading* and *Sugarloaf I*, we assume familiarity with those decisions. Both opinions describe the scheme Rogers designed and implemented to generate artificial but tax-deductible losses for high-income U.S. taxpayers. Suffice it to say that the scheme worked through a partnership's acquisition and subsequent transfer of highly distressed or uncollectible accounts receivable from retailers located in Brazil. The point of the transfers was to convey interests in the receivables—assets with meaningful face value but no economic value in the hands of the Brazilian retailers—to U.S. taxpayers, who then deem them uncollectible and use the concocted loss to reduce their tax liability.

The IRS caught on to these so-called distressed asset/debt or DAD schemes and encouraged Congress to outlaw them. Congress accepted the invitation with its enactment of the American Jobs Creation Act of 2004, Pub. L. No. 108-357, § 833, 118 Stat. 1589. Rogers then returned to the drawing board to find a workaround. He devised a modified transactional structure employing various trusts. In *Sugarloaf I*, we agreed with the Tax Court that the structural modifications changed little and indeed only perpetuated fraudulent tax avoidance. See 911 F.3d at 859. We therefore upheld the Commissioner's adjustments to the income reported on Sugarloaf's 2004 and 2005 partnership returns, disallowance of certain business expense deductions for those years, and the imposition of two distinct penalties. See *id.* at 859–61. Along the way we explained why the Tax Court was right to conclude that the Sugarloaf partnership was a sham—formed not to

operate a debt collection business but instead to generate fictitious losses designed for U.S. taxpayers to use to evade federal tax obligations. See *id*.

Our attention this time around is on tax years 2006, 2007, and 2008. Rogers insists that "Sugarloaf 2006–2008" is "completely different" than "Sugarloaf 2003–2005." The key difference, he urges, follows from an organizational restructuring—rollups of the partnership—that resulted in Sugarloaf acquiring new partners and managers from 2006 to 2008 and recommitting to a clear and lawful profit motive. The Tax Court reached the opposite conclusion: it found that the "record lacks any coherent thread of evidence to support Mr. Rogers' assertion that a legally enforceable change in ownership occurred." Even more, the court found that "no economic consequence resulted from the alleged rollups" of the Sugarloaf partnership. Put most simply, we see no error in the conclusion that Sugarloaf was a sham partnership before and after the purported rollups. See *Estate of Kunze v. Comm'r*, 233 F.3d 948, 950 (7th Cir. 2000) (noting that we review the Tax Court's "factual determinations, as well as applications of legal principles to those factual determinations, only for clear error"); *Kikalos v. Comm'r*, 434 F.3d 977, 982 (7th Cir. 2006) (articulating the same standard).

On another front, Rogers contests the Tax Court's determination that all of Sugarloaf's income for 2006, 2007, and 2008 should be allocated to Jetstream, an entity wholly owned by Rogers that served as Sugarloaf's tax matters partner. We see no reason to upset that determination, especially given the overwhelming evidence supporting the Tax Court's conclusion that Sugarloaf remained a sham partnership throughout the tax years in question in this appeal. The upshot of the Tax

Court's income-allocation determination is that Sugarloaf's income ultimately becomes allocated to Rogers, the individual who controlled the partnership for all intents and purposes. Here, too, we see no error (factual or legal) in that determination by the Tax Court.

Rogers advances a host of other arguments in his briefs. He urges us, for example, to set aside the Tax Court's findings that certain investor deposits to the trusts constitute income to Sugarloaf and that the partnership cannot deduct certain putative operating expenses. We construe Rogers's arguments not so much as rooted in alleged legal errors by the Tax Court, but rather as challenges to specific findings of fact that provided the foundation for the Tax Court's ultimate legal conclusions. In light of our opinions in *Superior Trading* and *Sugarloaf I*, we see little value in a detailed articulation of why the Tax Court's various findings of fact reflect no clear error. Nor does our fresh look at the Tax Court's opinion reveal any legal errors affecting the 2006, 2007, and 2008 tax years.

Only one further point warrants underscoring. The Internal Revenue Service, Tax Court, and now our court have devoted substantial resources over multiple proceedings to deciphering foreign and domestic transactions, understanding complex tax structures, and separating the fair from the fraud. None of this has gone well for Rogers or his partnership, the Sugarloaf Fund. While we cannot control any party's litigation choices, we can sound caution to those who persist in pressing claims lacking any merit. The time has come to do so here, and we AFFIRM.